## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFEX FOUNDATION, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 21-cv-161 |
| v. | Chief Judge Beryl A. Howell |
| SAFETH, LTD., *et al.*, | |
| Defendants. | |

### MEMORANDUM OPINION

Plaintiffs Daniel Dabek, Safex Foundation, Inc., and Safe Exchange Foundation, LLC,

seek a preliminary injunction "to enjoin Defendants Safeth, Ltd., Joseph Lathus, and Cynthia

Lathus from infringing on Plaintiffs' trademarks and from disseminating written or oral

statements that Safex or Mr. Dabek are engaged in a 'scam' or any other criminal activity."  Pl.'s

Mot. Prelim. Inj. ("Pls.' Mot.") at 1, ECF No. 4.  Plaintiffs develop cryptocurrencies and a

cryptocurrency-based e-commerce platform, and allege that defendants, who are proceeding *pro*

*se* in this action, have infringed plaintiffs' trademark, used the trademark to market their own

competing cryptocurrency and cryptocurrency-based e-commerce exchange, and have defamed

plaintiffs by publicly stating both that *plaintiffs* are infringing *defendants'* trademark, and that

plaintiffs are engaged in criminal activity.[1]  On January 27, 2021, following a hearing on January

26, 2021, at which plaintiffs and defendants both participated, *see* Min. Entry (Jan. 26, 2021), a

temporary restraining order was entered enjoining defendants from infringing on plaintiffs'

---

[1]      Defendants were repeatedly advised that corporate defendant Safeth, Ltd., as a limited company, "must be represented by counsel in this matter," Min. Order (Jan. 25, 2021) (citing *Greater Se. Cmty. Hosp. Found. v. Potter*, 586 F.3d 1, 4 (D.C. Cir. 2009)); *see also* Min. Order (Feb. 3, 2021); Hr'g Tr. at 4:24–5:15 (Jan. 26, 2021), ECF No. 22, yet no counsel has entered an appearance for defendant Safeth, Ltd., more than nine weeks after the initiation of the instant lawsuit.  Plaintiffs accordingly filed an Affidavit for Default, ECF No. 26, against defendant Safeth, Ltd., and the Clerk of the Court has entered a default against this defendant, *see* Entry of Default, ECF No. 29.

trademark and from publicly stating that plaintiffs were infringing on defendants' trademark. *See* Amended Temporary Restraining Order (Jan. 27, 2021), ECF No. 20.  The status quo remains largely unchanged since the entry of the temporary restraining order.  Since then, defendants have failed to file on the docket an opposition to plaintiffs' motion for a preliminary injunction, and no counsel for any of the three defendants has entered an appearance.[2]  Plaintiffs' only additional submission since the January 26, 2021 hearing and the entry of a temporary restraining order is a supplemental declaration of plaintiff Daniel Dabek.  *See* Supp. Decl. of Daniel Dabek ("Dabek Suppl. Decl."), ECF No. 28.  For the following reasons—largely the same reasons for which plaintiffs' Motion for a Temporary Restraining Order, ECF No. 4, was granted in part and denied in part—plaintiffs' Motion for a Preliminary Injunction is granted in part and denied in part.

## I.      BACKGROUND

Review of the procedural background of the instant lawsuit follows discussion of plaintiffs' relevant factual allegations against defendants.

### A.      Safex Develops Cryptocurrencies and a Cryptocurrency-Facilitated Online Marketplace

Plaintiffs Safex Foundation, Inc. and Safe Exchange Foundation,  LLC (together "Safex") were founded by plaintiff Dabek in 2015, with their principal place of business in Washington, D.C.  Decl. of Daniel Dabek ("Dabek Decl.") ¶¶ 3, 124.  Safex has launched three separate cryptocurrencies, Safe Exchange Coin, Safex Tokens and Safex Cash.  *See id.* ¶ 4.  In November 2015, Safex conducted a sale of its first cryptocurrency, Safe Exchange Coin, *id.* ¶ 13, and

---

[2]      Notwithstanding the Court's instruction otherwise, *see* Min. Order (Jan. 25, 2021), defendant Joey Lathus has since sent multiple emails to Chambers, none of which appears to be an "opposition" but which consist mainly of links to other online materials, attached screenshots, and additional accusations of criminal activity against defendants.  The Court directed that these emails be docketed under seal.  *See* Min. Order (Mar. 26, 2021); Sealed Document, ECF No. 30.

launched its second and third currencies, Safex Tokens**,** in September 2018, *see id.* ¶¶ 17–18. Then, in December 2020, Safex launched Safex Marketplace, an e-commerce platform where consumers would be able to buy and sell goods and services using Safex Cash.  *Id.* ¶¶ 5, 18.[3]  In addition to selling cryptocurrencies and developing its marketplace, Safex presents educational events, owns and operates a website, blog, and forum, and is active on social media, including Twitter, Facebook, and YouTube.  *See id.* ¶¶ 6–12.

Safex has been using the mark "Safex" on its websites and products since 2015, *see id.* ¶ 9, and has been using its logo since Dabek commissioned it in 2017, *id.* ¶ 20.  The mark and logo (collectively, the Safex trademark) are also used to identify Safex Cash and Safex Tokens on so-called "listing websites," which are online resources that provide consumers with information about cryptocurrencies, including price information, and so-called "cryptocurrency exchanges," where users can actually buy and sell cryptocurrencies.  Pl.'s Mem. Supp. Mot. Prelim. Inj. ("Pls.' Mem.") at 5, ECF No. 4.  Until the events giving rise to the instant lawsuit, however, plaintiffs never registered the mark "Safex" or the Safex logo with the U.S. Patent and Trademark Office ("USPTO").  *See* Dabek Decl. ¶¶ 62–64.

According to plaintiffs, defendant Joey Lathus began independently promoting Safex's cryptocurrencies in 2018 and 2019, speaking positively of Safex's products on his YouTube and Twitter accounts.  *See id.* ¶¶ 44–49; *see also* Pls.' Mem. at 6–7.[4]  Thereafter, later in 2019, he approached plaintiff Dabek about the possibility of being hired as a paid marketing consultant, but Dabek told Lathus that he was not interested in the offer.  Dabek Decl. ¶¶ 50–51.  Lathus

---

[3]     Evidently, the exchange has been renamed "The World Marketplace."  *See* Suppl. Decl. of Daniel Dabek ¶ 21, ECF No. 28.  For clarity, it will be referred to as "Safex Marketplace," the name used at the time of defendants' statements and activities that are at issue in the instant lawsuit.

[4]     For instance, on May 23, 2019, Lathus posted on Twitter a picture of the Safex platform, including the Safex logo, and stated that Safex has a "BRIGHT future," Compl. ¶ 78, ECF No. 1, and on July 4, 2019, he posted on Twitter, "YOULL KICK YOURSELF HARD IF YOU DON'T OWN" Safex, and declared himself "All in on #safex $sft," *id.* ¶ 79.

continued his attempts to be hired as a marketing consultant for Safex's products, *id.* ¶ 52, but, according to plaintiffs, soon shifted his strategy and decided to begin competing with Safex and "to steal the Safex Trademark[] and to disseminate defamatory statements about [Dabek] and Safex." *Id.* ¶¶ 53–55.

### B.   Defendants Allegedly Infringe Plaintiffs' Trademark and Begin Developing Products to Compete with Plaintiffs'

In late 2019, defendants created Safeth Ltd., designed to create a cryptocurrency to compete with Safex's two currencies, which cryptocurrency Safeth called "Safex Platinum." *See id.* ¶ 57; Pls.' Mem. at 8. Safeth created a website, whose name and address includes "Safex," in order to market Safex Platinum and also advertised the cryptocurrency on social media, including Facebook, Twitter, LinkedIn, and YouTube, using the mark "Safex Platinum" and a logo that bears a nearly identical resemblance to Safex's logo, with only the color of the logo noticeably different. Dabek Decl. ¶¶ 57–61; *see also id.* ¶ 55 (visual comparison of the respective Safex and Safeth logos). At the same time, Safeth also announced the development of a marketplace, called "Safex Platinum Market Place," which was functionally similar to Safex Marketplace. *Id.* ¶¶ 57, 88; *see also* Pls.' Mem. at 8. Further, Safeth issued a "white paper," akin to a prospectus for potential cryptocurrency purchasers, that closely resembles a "blue paper," also like a prospectus, written by plaintiffs for their Safex currencies. *See* Dabek Decl. ¶¶ 79–89 (highlighting similarities between the language of plaintiffs' blue paper and that of defendants' white paper).

On July 17, 2020, defendants filed a trademark application at the USPTO for "Safex Platinum" and the Safex Platinum logo, which application remains pending. Dabek Decl. ¶ 62; Pls.' Mem. at 9; *see also* Dabek Decl., Ex. R, July 17, 2020 Trademark/Service Mark Application, No. 90058254, ECF No. 4-19. In their USPTO application, defendants stated that

the trademark's first use in commerce was in December 2019.  Dabek Decl. ¶ 63.  In November 2020, a USPTO examiner alerted defendants to a defect in the application, and they submitted a revised application in December 2020, which again stated that the trademark's first use in commerce was in December 2019.  *See id.* ¶ 95; Pls.' Mem. at 9; *see also* Dabek Decl., Ex. BB, Dec. 30, 2020 Response to Office Action, No. 90058254, ECF No. 4-29.

Meanwhile, plaintiffs filed a USPTO trademark application of their own for the Safex trademark on December 24, 2020.  Dabek Decl. ¶ 42; *see also id.*, Ex. P, Dec. 24, 2020 Trademark/Service Mark Application, No. 90410526, ECF No. 4-17.  Five days later, on December 29, 2020, they mailed defendants a cease and desist letter, requesting that defendants cease (1) infringing plaintiffs' trademark, (2) publicly stating that plaintiffs were infringing defendants' trademark, (3) making misrepresentations to the USPTO, and (4) making other defamatory statements about plaintiffs.  Dabek Decl. ¶¶ 92–94; *see also id.*, Ex. AA, Dec. 29, 2020 Letter from Joseph B. Evans to Joey Lathus et al. ("Cease and Desist Letter") at 1–2, ECF No. 4-28.  The letter demanded a response by January 8, 2021, *see* Cease and Desist Letter at 2, but defendants furnished no response, Dabek Decl. ¶ 96, although social media accounts that plaintiffs allege belong to defendants posted publicly about the cease and desist letter, *id.* ¶¶ 97–99.[5]

### C.    Defendants Allegedly Mount a Campaign Against Plaintiffs and Their Products

Plaintiffs allege that defendants have used their pending trademark application to attempt, sometimes successfully, to disadvantage Safex and its products.  Specifically, defendants have supposedly relied on allegations of trademark infringement to convince Twitter to suspend

---

[5]    At the January 26, 2021 hearing on plaintiffs' Motion for a Temporary Restraining Order, ECF No. 4, defendants denied that any of these accounts were theirs.  *See* Hr'g Tr. 40:20–41:14.

Dabek's account on that website, which inhibited Safex's ability to advertise the launch of its currencies and marketplace. *Id.* ¶¶ 76–78. Defendants have also allegedly relied on their pending trademark application, and allegation that plaintiffs are infringing that trademark, to convince the cryptocurrency listing website CoinGecko to delist Safex currencies. *Id.* ¶¶ 65–68, 70–72; Pls.' Mem. at 10–11. Additionally, defendants have allegedly attempted to use the allegation of trademark infringement to convince the cryptocurrency exchange Livecoin to delist Safex currencies, such that potential cryptocurrency customers would be unable to buy or sell Safex's currencies on Livecoin. Dabek Decl. ¶¶ 69, 71, 74–75.

In addition, plaintiffs allege that defendants have posted online that Safex is a "scam" or an "exit scam," in which Safex is a ploy to sell Safex cryptocurrencies to users with the promise that the currency will have certain functionalities and the hope that it will reach certain valuations, and then abandon development of the currency while absconding with the money that was raised through the cryptocurrency sales. *Id.* ¶¶ 104, 108–11. Plaintiffs have provided Twitter posts from accounts they claim are controlled by defendants, referring to "safex exit scam," and warning others not to buy Safex's cryptocurrencies. *Id.* ¶¶ 109–11; *see also infra* note 12. Furthermore, defendants have also posted online suggesting that Safex Marketplace is akin to Silk Road or AlphaBay, both notorious "dark web" marketplaces primarily used for illegal transactions in, for example, illegal drugs, weapons, human trafficking, and murder for hire. *Id.* ¶¶ 113–15; *see also infra* note 12. Specifically, defendant Joey Lathus suggested that Safex Marketplace bore a resemblance to those websites due to the anonymity of Safex Marketplace and Safex Cash. *See* Dabek Decl. ¶¶ 113–14.

In a series of emails with which he has peppered the Court and plaintiffs' counsel since the initiation of the instant lawsuit, *see* Sealed Document ("Mar. 26, 2021 Emails"), ECF No. 30,

defendant Joey Lathus has provided insight into the basis for his claims that Safex is an exit scam and that Safex Marketplace will facilitate illegal transactions. Specifically, according to defendant, plaintiff Dabek, the founder of Safex, until recently lived and worked in Belgrade, Serbia, where he was the lead developer of a cryptocurrency called Dascoin. *Id.* Dascoin was ultimately deemed to be a scam, however, and was subject to enforcement actions in Canada and Poland. *See id.* Thus, Lathus argues, because of Dabek's past involvement with the development of a scam cryptocurrency, and because of certain similarities he observes between Dascoin and Safex's cryptocurrencies, Safex may also be a scam. In support of his comparison of Safex Marketplace to Silk Road and Alphabay, Lathus has provided the Court with numerous screenshots showing anonymous social media users speculating, predicting, or even celebrating that, due to the anonymity that characterizes both the Safex Marketplace itself and the cryptocurrencies that will be used to facilitate sales on the platform, Safex Marketplace may facilitate the sorts of illegal transactions that flourished on Silk Road and Alphabay. *See id.*

### D.   Procedural Background

Plaintiffs initiated the instant lawsuit on January 18, 2021, alleging trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), *see* Compl. ¶¶ 186–95, ECF No. 1 (Count One); common law trademark infringement, *see id.* ¶¶ 199–207 (Count Two); defamation *per se*, *see id.* ¶¶ 208–15 (Count Three); false light invasion of privacy, *see id.* ¶¶ 216–23 (Count Four); and unfair competition, *see id.* ¶¶ 224–33 (Count Five). Plaintiffs seek a permanent injunction of plaintiffs' trademark infringement and defamation, a declaratory judgment that defendants have infringed their trademark, damages, and attorneys' fees. *See id.* at 38–39.

On the same day, plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. *See* Pls.' Mot. Plaintiffs sought to enjoin defendants from engaging in three behaviors: (1) infringing on the Safex trademark; (2) publicly stating or otherwise

representing that they own the Safex trademark or that Safex was infringing Safeth's trademark; and (3) making defamatory statements about defendants, including that Safex is an exit scam and that Safex Marketplace is a dark web illicit marketplace akin to Silk Road or Alphabay. *See* Compl. at 38; *see also* Pls.' Mem. at 3.

On January 26, 2021, at a hearing held on plaintiffs' motion for a temporary restraining order, defendants represented themselves *pro se*. *See* Min. Entry (Jan. 26, 2021).[6]  Plaintiffs' motion for a temporary restraining order was granted in part and denied in part, based on a determination that plaintiffs met the requirements for temporary injunctive relief as to defendants' alleged trademark infringement and their public statements that plaintiffs were infringing defendants' trademark, but not as to defendants' allegedly defamatory statements that Safex was an exit scam and that Safex Marketplace would facilitate illegal transactions. *See* Hr'g Tr. at 74:6–75:1 (Jan. 26, 2021), ECF No. 22.  Specifically, the Court found that plaintiffs had not met their burden to establish that they would likely prevail on their defamation claim based on defendants' statements accusing plaintiffs of criminal behavior, because plaintiffs had not demonstrated that they would likely be able to prove that defendants' statements were false and, in fact, had not addressed the truth or falsity of defendants' statements at all.  *See id.* at 67:11–22.

Accordingly, a temporary restraining order was entered enjoining defendants from (1) "[u]sing in commerce or in connection with any good or service plaintiffs' 'Safex' mark and logo," including any "mark, name, or design that creates a likelihood of confusion with

---

[6]        Although defendants had not filed a formal opposition to plaintiffs' Motion for a Temporary Restraining Order, between January 20, 2021 and January 25, 2021, defendant Joey Lathus sent the Court nine emails, which the Court docketed under seal.  *See* Sealed Document, ECF No. 15.  Nearly all of the emails included links to third party websites and attached image files, consisting primarily of screenshots of online news articles and social media posts.  Thus, although defendants did not file a formal opposition, they made their views known, at least as to some of the claims of the Complaint, primarily relating to plaintiffs' allegations of defamation.

plaintiffs' 'Safex' mark and logo"; (2) "[d]isseminating, on . . . [any] public forums, any written or oral statements that plaintiffs are infringing upon defendants' trademarks"; and (3) "making . . . misrepresentations to the U.S. Patent and Trademark Office" concerning defendants' infringing trademark.  Amended Temporary Restraining Order at 1–2.  The temporary restraining order would "remain in effect pending this Court's ruling on plaintiffs' Motion for a Preliminary Injunction," *id.* at 2, the Court "having determined that there is good cause for an extension" of the temporary restraining order beyond the ordinary 14-day limit, Min. Order (Feb. 3, 2021).

Plaintiffs' Motion for a Preliminary Injunction is now ripe for resolution.

## II.    LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain relief, the moving party must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first factor is the "most important factor," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006))), and

failure to show likelihood of success on the merits is alone sufficient to defeat a motion for a preliminary injunction, *see Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009) (citing *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006)).[7]  A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)); *see also Sherley*, 644 F.3d at 392 (citing *Winter*, 555 U.S. at 22); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" (quoting 7 J.W. MOORE, FEDERAL PRACTICE ¶ 65.04(1), at 1627 (2d ed. 1968))).

## III.    DISCUSSION

Plaintiffs seek to preliminarily enjoin defendants from infringing the Safex trademark and from defaming plaintiffs, in the form of statements that plaintiffs are in fact infringing defendants' trademark and that plaintiffs are engaged in criminal or otherwise wrongful activity. These requests for injunctive relief are considered in turn.

---

[7]     The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018 (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *see Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 16 n.6 (D.D.C. 2020); *Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

### A.      Plaintiffs' Trademark Infringement Claim

The four preliminary injunction factors are analyzed with respect to plaintiffs' request to enjoin defendants from their alleged trademark infringement, beginning with the first factor, likelihood of success on the merits, and then proceeding to the remaining three factors.

### 1.      *Likelihood of Success on the Merits*

To succeed on their trademark infringement claim, plaintiffs will need to show that (1) they own a valid trademark; (2) their trademark is distinctive or has acquired a secondary meeting; and (3) there is a substantial likelihood of confusion between the plaintiffs' mark and the alleged infringer's mark.  *See Am. Soc'y for Testing & Materials v. Pub. Resource Org., Inc.*, 896 F.3d 437, 455–56 (D.C. Cir. 2018); *Sears, Roebuck & Co v. Sears Fin. Network*, 576 F. Supp. 857, 861 (D.D.C. 1983).

First, to show ownership of trademark, plaintiffs must show that they were the first to use the mark in commerce.  *See United States v. Steffens*, 100 U.S. 82, 85 (1879); *see also, e.g.*, *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*, 859 F.3d 1023, 1027 (Fed. Cir. 2017). Second, to show that a trademark is distinctive or has secondary meaning, plaintiffs can demonstrate that their claimed trademark is "arbitrary," meaning that it is a term that "is commonly used in the language, but has no intrinsic connection to the product," *Blinded Veterans Ass'n v. Blinded Americans Veterans Found.*, 872 F.2d 1035, 1040 (D.C. Cir. 1989), or, alternatively, that it is a "fanciful" term, meaning that it is "coined for the purpose of serving as a trademark," *id.*  Both "arbitrary and fanciful terms are inherently distinctive," such that "they are protectable without proof of secondary meaning."  *Id.*  Third, to show confusion, plaintiffs must demonstrate "that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the alleged infringer's] mark."  *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.

1993) (quoted in *Am. Soc'y for Testing & Materials*, 896 F.3d at 456); *see also Sears, Roebuck*, 576 F. Supp. at 863 (explaining that confusion requires that the trademark and alleged infringing trademark be "sufficiently similar to create the probability that some consumers might believe that the two marks originated from the same source or that some consumers might mistake one mark for the other when seeing or hearing the mark alone").  Plaintiffs have shown likelihood of success as to all three prongs.

### a.  Ownership of the Safex Trademark

First, plaintiffs have shown likelihood of success as to ownership of the Safex trademark. Neither plaintiffs nor defendants has registered their respective trademark and both sides have pending trademark applications before the USPTO.  These facts are not dispositive of ownership because the Lanham Act protects unregistered trademarks in addition to registered trademarks. *See* 15 U.S.C. § 1125(a); *see also Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A.*, 743 Fed. App'x 457, 462 (D.C. Cir. 2018) ("The Lanham Act provides a right of action for [trademark infringement] in relation to both registered and unregistered marks.").  Rather, "because use in commerce, not mere registration, is the *sine qua non* of a trademark right under the Lanham Act," *id.* at 463, an unregistered mark may nevertheless be protected, even when a plaintiff seeks to enforce an unregistered trademark against an infringing defendant who has a registered trademark.  *See Lyons*, 859 F.3d at 1032 (upholding decision of USPTO Trademark Trial and Appeal Board that defendant, rather than plaintiff, owned disputed trademark, even though plaintiff had registered the trademark and defendant had not, because defendant was first to use trademark in commerce).

The Lanham Act defines "use in commerce" as the "bona fide use of a mark in the ordinary course of trade, and not . . . merely to reserve a right in a mark."  15 U.S.C. § 1127.

Under the Lanham Act, a mark is used in commerce when the trademark is placed on "documents associated with the goods or their sale, and . . . the goods are sold or transported in commerce." *Id.* By offering Safex Tokens and Safex Cash for sale and use for transactions to buyers on the internet since at least 2017, *see* Dabek Decl. ¶¶ 20–22, 38, Safex has been using the trademark in commerce. Furthermore, its website and marketing efforts all identify its cryptocurrencies using the trademark, and third parties, including listing websites and cryptocurrency exchanges also identify Safex currencies using the trademark. *Id.* To be sure, Safeth also appears to have used the trademark in commerce, given that Safex Platinum had been advertised for sale on Safeth's website. *Id.* ¶¶ 55–58. Safeth had been offering Safex Platinum for sale only since late 2019, however, and, as such, its use of the trademark is junior to Safex's. *See id.* ¶ 55. Plaintiffs have therefore demonstrated that they will likely succeed in proving that they own the Safex trademark.

### b. Distinctive and Confusion Prongs of the Trademark Infringement Inquiry

Plaintiffs have also demonstrated likelihood of success on the merits as to the second prong of the trademark inquiry. They have shown that their trademark is likely inherently distinctive, because the name and logo, consisting of a made-up word and an abstract image, possibly of a dolphin, bear no intrinsic connection to the products Safex offers using that trademark, namely Safex's cryptocurrencies and the Safex Marketplace. *See Blinded Veterans Ass'n*, 872 F.2d at 1040. The Safex trademark is therefore an arbitrary term that is inherently distinctive.

Finally, plaintiffs have also demonstrated that they are likely to succeed on the confusion prong, given that defendants' mark "Safex Platinum" includes "Safex," suggesting that it is connected with or developed by Safex. Further, Safex and Safeth both use the trademark to

designate cryptocurrencies, and Safeth's logo is nearly a carbon-copy of Safex's logo.  In these circumstances, where two parties use the same mark and nearly identical logos to advertise and sell functionally similarly products, confusion is likely.  *See, e.g.*, *Louis Vuitton Malletier S.A.S. v. Guang Da Grp., Inc.,* No. 18-cv-2812, 2018 WL 7141337, at *1 (D.D.C. Dec. 3, 2018) (granting temporary restraining order in trademark infringement case based, in part, on the defendants' use of a logo identical to plaintiffs' to sell imitation products).

Since plaintiffs have shown that they will likely be able to prove that they were the first to use the contested trademark in commerce, that the trademark is inherently distinctive because arbitrary, and that confusion between the Safex trademark and defendants' trademark is likely, they have has satisfied all three prongs of the trademark infringement inquiry and shown that they will likely succeed on its trademark infringement claims.

### 2.    *Irreparable Harm*

Plaintiffs must also show that they will suffer irreparable harm absent a preliminary injunction, *League of Women Voters*, 838 F.3d at 6, and they rightly note, Pls.' Mem. at 30, that "[t]rademark infringement by its very nature causes irreparable injury."  *Appleseed Found. Inc. v. Appleseed Inst., Inc.*, 981 F. Supp. 672, 677 (D.D.C. 1997) (citing *Sears, Roebuck*, 576 F. Supp. at 864).  Plaintiffs further argue that they have lost their ability to control the Safex brand and goodwill, Pls.' Mem. at 30–31, without distinguishing this loss from the inherent irreparable injury caused by trademark infringement, since both this loss and injury are inextricably intertwined.  *See Sears, Roebuck*, 576 F. Supp. at 864 (apparently equating the irreparable harm caused by trademark infringement with "the dilution of the distinctiveness of [plaintiff's] trademark, the loss of control of its reputation[,] and the diminishment of its good will").

Regardless, defendants' alleged infringement occurs at a critical time for Safex's products, as Safex recently launched an e-commerce marketplace and its currencies have not been widely adopted or popular, and do not appear to be especially valuable, at least for now. *See* Pls.' Mem. at 1–2. Given their relative novelty, cryptocurrencies and their related markets and products present a significant opportunity for unscrupulousness and, consequently, many would-be customers are wary of new and unknown products. Against that backdrop, not surprisingly, the reputation of a cryptocurrency, its marketers, and its development team is crucial for the currency's success, and reputational harms can cause serious damage to a fledgling cryptocurrency. *See* Dabek Decl. ¶¶ 68–69, 71; Pls.' Mem. at 11. Thus, plaintiffs are particularly susceptible to the injury caused by defendants' alleged trademark infringement.

Further bolstering the conclusion that plaintiffs face the prospect of irreparable harm absent an injunction is evidence that plaintiffs have cited suggesting that defendants have relished the harm that they have caused and are causing to plaintiffs. Specifically, they quote a Facebook post in which defendant Joey Lathus claims, "Safex is dead and I killed it"; another in which Lathus seems to celebrate that Dabek was suspended from Twitter, writing "#safex taken from Twitter due to trademark infringement[,] [c]ompliments of Safeth"; and a third in which defendant Cynthia Lathus writes, "Joey killed the [S]afex market before it could even begin." Compl. ¶ 114. These statements indicate, at a minimum, that defendants are aware that their conduct is having deleterious consequences for Safex and further strongly suggest that defendants will continue their conduct absent an injunction. Accordingly, plaintiffs have shown that defendants' alleged trademark infringement will cause them irreparable injury.

### 3.    *The Balance of Equities and the Public Interest*

The remaining two preliminary injunction factors, the balance of equities and the public interest, also weigh in plaintiffs' favor with respect to their trademark infringement claim.

First, the balance of equities favors preliminary injunctive relief.  Plaintiffs' use of the Safex trademark has occurred in the ordinary course of its business, namely, to market its cryptocurrencies and the Safex Marketplace, and defendants' behavior has had identifiable detrimental effects on their ability to market successfully their cryptocurrencies.  Although defendants also appear to have used their allegedly infringing trademark in the course of a competing business, by attempting to develop a competing cryptocurrency, the scope of their legitimate efforts to create a currency, separate from repurposing and repackaging Safex's work to develop its currencies and marketplace, are unclear.  Defendants' conduct instead seems primarily designed around harassing plaintiffs and frustrating their business efforts to turn Safex's products into valuable cryptocurrencies and a popular site of online, cryptocurrency-facilitated commerce.  Plaintiffs also cite other alleged bad-faith behavior by defendants, including making personal threats against Dabek, *see* Dabek Decl. ¶ 121, and encouraging users on the anonymous internet message board 4chan to attack Safex on Twitter, *see id.* ¶¶ 119–20. Defendants, for their part, insinuate that Joey and Cynthia Lathus have been the object of threats and "doxxing," by having their identities made public, by supporters of Safex and Dabek.  *See* Sealed Document ("Jan. 25, 2021 Emails"), ECF No. 15; Mar. 26, 2021 Emails.  Nevertheless, despite the level of acrimony on all sides, the balance of equities tips slightly in plaintiffs' favor.

Second, a preliminary injunction is also in the public interest.  In evaluating whether an injunction in the trademark infringement context is in the public interest, courts have noted that "[i]t is within the public interest for the Court to take action to prevent public deception and

confusion over the source or origin of goods," *Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 17, 21 (D.D.C. 2013) (citing *Sears, Roebuck*, 576 F. Supp. at 865), and that "[t]he public has a right not to be deceived or confused," *Crime Control, Inc. v. Crime Control, Inc.*, 624 F. Supp. 579, 582 (D.D.C. 1984).  As explained, a substantial likelihood of confusion exists given the very close similarity between plaintiffs' trademark and the allegedly infringing trademark being used by defendants, and the fact that the two trademarks are being used for very similar products in the same market.  Preventing this confusion is in the public interest, *see Delta Sigma Theta*, 215 F. Supp. 3d at 21; *Crime Control, Inc.*, 624 F. Supp. at 582, and the public interest therefore favors an injunction with respect to defendants' alleged trademark infringement.  As all four factors weigh in favor of injunctive relief as to plaintiffs' trademark infringement claim, plaintiffs' request to preliminarily enjoin defendants' infringing behavior will be granted.

## B. Plaintiff's Defamation Claim

Plaintiffs' request for a preliminary injunction based on their defamation claim is next addressed.  Specifically, plaintiffs seek to enjoin defendants from making two categories of statements: (1) that plaintiffs are infringing defendants' trademark, and (2) that plaintiffs are engaged in criminal activity.  The analysis for these two categories of allegedly defamatory statements differs significantly, and plaintiffs have satisfied the requirements for a preliminary injunction only as to the first category of statements.  With respect to the second category of statements, in contrast, plaintiffs have failed to demonstrate that they will likely succeed on the merits of their defamation claim.

### 1. *Likelihood of Success on the Merits*

To succeed on their defamation and false light invasion of privacy claims, under D.C. law, plaintiffs must show that: (1) defendants made a false and defamatory statement concerning

17

plaintiffs; (2) defendants published the statement to a third party; (3) defendants' fault in publishing the statement amounted to at least negligence; and (4) the statement's publication caused plaintiffs special harm or else was actionable as a matter of law irrespective of special harm. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (citing *Crowley v. N. Am. Telecommc'ns Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997)); *see also, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 533–34 (D.C. Cir. 2013).[8]  Regarding the third prong, because plaintiff Dabek is a limited-purpose public figure, *see infra* Part III.B.1.a, plaintiffs must prove that defendants acted with actual malice, rather than mere negligence. *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016). Further, since "[c]ostly and time-consuming defamation litigation can threaten [the] essential freedoms" guaranteed by the First Amendment, in order to preserve those freedoms "and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl*, 856 F.3d at 109.

The likelihood that plaintiffs will be able to demonstrate that these four factors are satisfied is considered separately for statements that plaintiffs are infringing defendants' trademark and statements that plaintiffs are engaged in criminal activity, following explanation that plaintiff Dabek is a limited-purpose public figure.

---

[8]     Plaintiffs' false light invasion of privacy claim rises or falls with their defamation claim, as the claims rely on the same facts, *see* Pls.' Mem. at 19–20, and when a plaintiff relies upon the same factual allegations to establish both defamation and false light invasion of privacy, the D.C. Court of Appeals "analyze[s] them in the same manner," *Armstrong v. Thompson*, 80 A.3d 177, 188 (D.C. 2013); *see also Conejo v. Am. Fed'n of Gov't Emps., AFL-CIO*, 377 F. Supp. 3d 16, 32 (D.D.C. 2019) (citing *Armstrong*, 80 A.3d at 188); *Tah v. Global Witness Publ'g, Inc.*, No. 19-7132, 2021 WL 1045205, at *8 (D.C. Cir. Mar. 19, 2021) ("[A] 'plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim' and . . . '[t]he First Amendment considerations that apply to defamation therefore apply also to [plaintiffs'] counts for false light' . . . ." (second and third alterations in original) (quoting *Farah*, 736 F.3d at 540).

### a.  Plaintiff Daniel Dabek Is a Limited-Purpose Public Figure

At the outset, whether plaintiff Dabek is a limited-purpose public figure, as just noted, has important ramifications for the law applicable to his defamation claim against defendants. "Public figures are those who have 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'"  *Id.* at 114 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).  "Because of the prominent role that those individuals have sought for themselves on certain issues, their 'views and actions with respect to public issues and events are often as much concern to the citizen' as those of public officials."  *Id.* (quoting *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162 (1967) (Warren, C.J., concurring in the judgment).  Since "[f]ew people 'occupy positions' of such 'power and influence that they are deemed public figures for all purposes,'" *id.* (quoting *Gertz*, 418 U.S. at 345), "[m]ore commonly, public figures exercise that degree of power and influence on a limited range of topics or issues and are therefore known as 'limited-purpose public figures,'" *id.* (citing *Jankovic*, 822 F.3d at 584).  The law treats such limited-purpose public figures "as public figures, but only when it comes to the particular public controversies with which they are associated," *id.*, and "set[s] the 'dividing line between public and private figures based on those who assumed the risk of publicity and had access to channels of communication to defend themselves, and those who did not," *Jankovic*, 822 F.3d at 584–85 (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003)).  In setting this boundary between private persons and limited-purpose public figures, the Supreme Court "has 'been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise.'"  *Id.* at 585 (quoting *Gertz*, 418 U.S. at 342).

Whether Dabek "is a limited-purpose public figure is a 'matter of law for the court to decide.'" *Kahl*, 856 F.3d at 114 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc)); *see also Jankovic*, 822 F.3d at 585.  A three-part test is employed to determine whether a plaintiff is a public figure: "First, the court must decide the relevant controversy and determine whether it is a public controversy.  Second, the plaintiff must have played a significant role in that controversy.  Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Kahl*, 856 F.3d at 114 (quoting *Jankovic*, 822 F.3d at 585); *see also Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir. 1980) (first articulating this three-pronged test).  "In conducting this analysis, a court must be mindful that 'the touchstone' of the limited-purpose public figure analysis remains determining 'whether an individual has assumed [a] role[] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'" *Jankovic*, 822 F.3d at 585 (alterations in original) (quoting *Lohrenz*, 350 F.3d at 1279).  Plaintiff Dabek satisfies all three prongs of the test and so is a limited-purpose public figure with respect to the launch of Safex's cryptocurrencies and online e-commerce marketplace.

First, the relevant controversy, the legitimacy and *bona fides* of Safex's products, is public.  "To determine whether there is a public controversy, the court 'must examine whether persons actually were discussing some specific question,'" *id.* (quoting *Waldbaum*, 627 F.2d at 1297), and a "controversy is a public one when a 'reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution,'" *id.* (quoting *Waldbaum*, 627 F.2d at 1297).  As defendants have repeatedly noted, they are far from the only individuals to have argued, due to Dabek's past involvement with a cryptocurrency subsequently revealed to be a scam and subjected to enforcement actions overseas, that Safex

may likewise be a scam; and, on the basis of certain features Safex Marketplace shares with Silk Road and Alphabay, that Safex Marketplace may be used to facilitate illegal transactions just as those latter two platforms were used.  *See generally* Jan. 25, 2021 Emails; Mar. 26, 2021 Emails; *see also infra* Part III.B.1.c.

For example, Lathus has provided the Court a link to Twitter users warning others that Safex's products are or may be a scam, claiming, *inter alia*, "If you more dip on $safex you will find more reasons why it is $scam," another claiming that after "2 years of dev [Safex] is still a vaporware, CEO used paid shill and dumb shill himself to pump his coin. He purposely lies about exchanges," and another who writes, "This Safex update is over a month old now. I don't think they know what ready means.  But hey, at least you can shill a scam another month!," plus multiple other users stating "Safex is a scam."  *See* Mar. 26, 2021 Emails.  He has also directed the Court's attention to third parties noting the similarities between Safex Marketplace on the one hand and Silk Road and Alphabay on the other.  *See id.*; Jan. 25, 2021 Emails.  For instance, he has provided links and screenshots showing other anonymous social media users stating, *inter alia*, "safex will sell crystal meth and homemade guns"; "I just want to buy drugs anonymously and tax free on a decentralized marketplace on its own blockchain, and with its own mineable currency. Maybe Safex one day"; "[on] Safex you will be able to buy all the cocaine and hookers you want."; and "Safex is going to be like alphabay . . . the only difference is that it cannot be taken down."  Jan. 25, 2021 Emails; *see also infra* note 11 and accompanying text.

Thus, the legitimacy of Safex's cryptocurrencies and the Safex Marketplace is plainly a question that "persons actually were discussing" online.  *Jankovic*, 822 F.3d at 585 (quoting *Waldbaum*, 627 F.2d at 1297).  Defendants, of course, are involved in this debate, and their participation therein is a principal catalyst for the instant lawsuit, yet the fact that defendants are

participants in the controversy does not diminish the fact that such controversy actually exists and is public.  Moreover, the controversy is also such that "persons beyond the immediate participants in the dispute" will likely "feel the impact of its resolution," *id.* (quoting *Waldbaum*, 627 F.2d at 1297), because anybody who has purchased or is considering purchasing Safex's cryptocurrencies has an obvious interest in the resolution of the issue of whether Safex's products are legitimate.  Accordingly, the public-controversy prong of the limited-purpose public figure analysis is satisfied.

Second, Dabek has "'thrust' himself to the 'forefront' of" this public controversy and has therefore had "the necessary impact" on the controversy.  *Jankovic*, 822 F.3d at 586 (quoting *Waldbaum*, 627 F.2d at 1297 n.27); *see also Kahl*, 856 F.3d at 115 ("Limited-purpose public figures have 'thrust themselves to the forefront' of a public controversy 'in order to influence the resolution of the issues involved.'" (quoting *Gertz*, 418 U.S. at 345)).  Here, the Court is particularly "mindful that 'the touchstone' of the limited-purpose public figure analysis" is determining "'whether [Dabek] has assumed [a] role[] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'"  *Jankovic*, 822 F.3d at 585 (second, third, fourth, and fifth alterations in original) (quoting *Lohrenz*, 350 F.3d at 1279).  He has.  Dabek is obviously at the center of this controversy, since the public debate over whether his company and products are trustworthy flow directly from the suspicion, based on his personal involvement with Dascoin, that Dabek himself is not trustworthy.  *See Waldbaum*, 627 F.2d at 1297 (noting that plaintiff "must have achieved a 'special prominence' in the debate" (quoting *Gertz*, 418 U.S. at 351)).

Moreover, Dabek has a robust public online presence aimed directly at promoting, and thereby implying the legitimacy of, Safex's products.  Since at least 2017, Dabek has issued a

stream of social media posts and press releases promoting Safex's products, and has also spoken as an expert at conferences on blockchain and cryptocurrency. *See* Jan. 25, 2021 Emails; Mar. 26, 2021 Emails; *see also Kahl*, 856 F.3d at 115 (noting that "the plaintiff's past conduct" is probative of whether plaintiff possesses the requisite role in the public controversy (quoting *Lohrenz*, 350 F.3d at 1279)). Indeed, by plaintiffs' own admission, Dabek has been involved in active public outreach and education efforts concerning Safex and its products through social media, *see* Compl. ¶¶ 6–12, which indicates that he has "purposefully tr[ied] to influence the outcome" of the controversy over the legitimacy of Safex's products or "could realistically have been expected, because of his position in the controversy, to have an impact on its resolution," *Jankovic*, 822 F.3d at 587 (quoting *Waldbaum*, 627 F.2d at 1297). Nor does the fact that the public controversy at issue is not of Dabek's own making mean that he does not possess the requisite role in that controversy, as "[o]ccasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome," *Waldbaum*, 627 F.2d at 1298. While a person does not become a limited purpose public figure *solely* by advertising his business to the public, *see, e.g.*, *id.* at 1299 ("Being an executive within a prominent and influential company does not by itself make one a public figure."), but in light of the nature of the controversy at issue here, namely whether Safex and its products are legitimate and trustworthy, Dabek's attempts to convince the public of their legitimacy by placing himself into the public sphere and marketing those products for sale and use satisfy the second prong of the limited-purpose public figure inquiry.

Third, defendants' statements at issue here are germane to the identified public controversy and Dabek's role therein. The germaneness requirement, which "ensures that [speakers] cannot use an individual's promise in one area of public life to justify publishing

23

negligent falsehoods about an unrelated aspect of the plaintiff's life," *Kahl*, 856 F.3d at 115

(quoting *Jankovic*, 822 F.3d at 589), provides that "'[m]isstatements *wholly unrelated* to the

controversy' are not protected [by the actual malice standard], but statements, including those

highlighting a plaintiff's 'talents, education, experience, and motives,' can be germane,"

*Jankovic*, 822 F.3d at 589 (emphasis added by *Jankovic*) (quoting *Waldbaum*, 627 F.2d at 1298).

This prong is plainly satisfied here, as defendants' statements at issue directly contribute to, and

indeed partially comprise, the debate over the public controversy at issue, namely whether Safex

and its products are trustworthy.  As such, those statements are far from "wholly unrelated," *id.*

(emphasis omitted) (quoting *Waldbaum*, 627 F.2d at 1298), to the relevant controversy, and the

third prong of the limited-purpose public figure analysis is therefore satisfied.

In sum, then, because all three prongs of the limited-purpose public figure analysis are

satisfied, the Court concludes that Dabek is a limited purpose public figure, such that, in order to

succeed on their defamation claim, plaintiffs must show that defendants acted with actual malice.

*Kahl*, 856 F.3d at 113; *Jankovic*, 822 F.3d at 589.[9]

### b.  Defendants' Statements Regarding Plaintiffs' Trademark Infringement

Having established that Dabek is a limited purpose public figure and so must satisfy the

actual malice standard in order to succeed on his defamation claim, plaintiffs' likelihood of

success on the merits as to their defamation claim based on defendants' statements alleging that

plaintiffs are infringing their trademark is now considered.

First, plaintiffs have established that they will likely be able to show that defendants'

statements that plaintiffs are infringing defendants' trademark were both false and defamatory.

---

[9]     Even if Dabek were not a limited-purpose public figure, such that plaintiffs needed to prove only negligence, rather than actual malice, in order to prevail on their defamation claim, the outcome of the analysis of plaintiffs' likelihood of success on the merits as to that claim would be unaffected.  *See infra* notes 11, 13.

A defamatory statement is one that makes the plaintiff appear "odious, infamous, or ridiculous." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C. 1970)).  Defamation *per se*, which plaintiffs allege here, occurs when a defendant makes a statement "so likely to cause degrading injury to the subject's reputation that proof of . . . harm is not required to recover compensation." *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012) (citing *Carey v. Piphus*, 435 U.S. 247, 262 (1978)); *see also, e.g.*, *Carey*, 435 U.S. at 262 n.18 ("The essence of [defamation] *per se* is the publication . . . of false statements imputing to a person a criminal offense; a loathsome disease; matter affecting adversely a person's fitness for trade, business, or profession; or serious sexual misconduct.").

Defendants' statements that plaintiffs are infringing defendants' trademark are likely defamatory *per se*, as those statements impute wrongdoing to plaintiffs and suggest that they are untrustworthy for their business, causing significant direct and indirect reputational effects on plaintiffs.  *See, e.g.*, *Moldea v. N.Y. Times Co.* ("*Moldea I*"), 15 F.3d 1137, 1142 (D.C. Cir. 1994), *modified*, *Moldea v. N.Y. Times Co.* ("*Moldea II*"), 22 F.3d 310 (D.C. Cir. 1994) ("Under District of Columbia law, a statement is defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" (quoting *Afro–American Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 (D.C. Cir. 1966) (en banc))); *see also id.* at 1145 ("[I]t is defamatory publicly to disparage a person's competence in his chosen field."). As explained, *see supra* Part III.A.2; *see also infra* Part III.B.2.a, such reputational effects have a special capacity for injury here, given that plaintiffs are attempting to develop a largely unknown product in a dynamic, tumultuous market with heightened sensitivity to products' and producers' reputations.  Defendants' false statements not only cast doubt on the legitimacy of Safex and its products, by stating that the company has violated trademark law, but has in fact had significant

negative consequences on plaintiffs' business efforts, given that, as explained, defendants were delisted from important cryptocurrency platforms as well as social media as a consequences of defendants' claims of trademark infringement.  *See also infra* Part III.B.2.a.

Plaintiffs will also likely be able to prove the falsity of these statements, which turns on the outcome of plaintiffs' trademark claim.  In other words, if plaintiffs are correct that they own the Safex trademark and that defendants are infringing that trademark, then defendants' claims to the contrary are false.  As explained, *see supra* Part III.A, plaintiffs have demonstrated a likelihood of success as to their trademark claim.  Therefore, they have also demonstrated a sufficient likelihood that defendants' statements that their Safeth trademark is being infringed by plaintiffs are false.

Second, statements in this category also meet the publication requirement.  This prong requires defendants to "have published or knowingly participated in publishing the defamation." *Tavoulareas v. Piro*, 759 F.2d 90, 136 (D.C. Cir. 1985) (emphasis omitted), *vacated in part on other grounds on reh'g*, 763 F.2d 1472 (D.C. Cir. 1985), *and on reh'g en banc*, 817 F.2d 762 (D.C. Cir. 1987) (en banc); *see also, e.g.*, *LaRue v. Johnson*, Civil Action No. 16-00504 (EGS/RMM), 2018 WL 1967128, at *4 (D.D.C. Feb. 22, 2018) ("Publication, for purposes of the second element, requires that the defamatory statement be communicated to one or more individuals 'other than the person defamed.'" (quoting *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017))).  Given that defendants publicly posted these statements on social media, in addition to directly contacting social media websites, cryptocurrency listing websites, and cryptocurrency exchanges in order to make these statements, this prong will likely be satisfied.

Third, plaintiffs have demonstrated that they will likely be able to prove that defendants acted with actual malice in publicly stating that plaintiffs were infringing their trademark.  The actual malice standard, a "daunting one," *Jankovic*, 822 F.3d at 590 (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509, 1515 (D.C. Cir. 1996)), that is a key bulwark in preserving the First Amendment's "most important role" of "protection of robust and uninhibited debate on important political and social issues," *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 346 (2019) (Alito, J., dissenting from denial of petition for a writ of certiorari) (citing *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also id.* at 348 ("The core purpose of the constitutional protection of freedom of expression is to ensure that all opinions on" "important and controversial issue[s]" "have a chance to be heard and considered."), requires a plaintiff to prove that the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 280; *see also Jankovic*, 822 F.3d at 589 (citing *N.Y. Times Co.*, 376 U.S. at 279–80).  "Actual malice may be inferred through circumstantial evidence, including 'the defendant's own actions or statements, . . . [or] the inherent improbability of the story.'"  *Kahl*, 856 F.3d at 116 (alteration in original) (quoting *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).  "Whatever proof is offered, that proof must show that 'the defendant *in fact* entertained serious doubts as to the truth of his publication.'"  *Id.* (emphasis added by *Kahl*) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  A plaintiff must prove actual malice by clear and convincing evidence, rather than the less demanding preponderance of the evidence standard.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The actual malice standard is satisfied as to this category of statements.  Given defendant Joey Lathus's prior involvement with and marketing of Safex and his resultant knowledge of Safex's use of its trademark to advertise and sell cryptocurrencies, defendants' statements to CoinGecko, Livecoin, and Twitter, as well as to the general public, that plaintiffs were infringing defendants' trademark appear to have been knowingly false.  In particular, defendants' misrepresentation in their USPTO application that the trademark had not been used in commerce prior to December 2019 was not inadvertent and was plainly false, given the applied-for trademark's obvious resemblance to, and indeed the logo's near duplication of, plaintiffs' Safex trademark.[10]  Finally, defendants' various social media posts indicating that they were aware of and in fact celebrated the harm that they were causing to plaintiffs by deplatforming them through allegations of trademark infringement, *see supra* Part III.A.2., further bolsters the conclusion that those statements were made with actual knowledge of falsity and therefore with actual malice.[11]

Fourth, these statements also satisfy the final defamation prong, that is, they are "actionable as a matter of law irrespective of special harm," *Oparaugo*, 884 A.2d at 76 (quoting *Crowley*, 691 A.2d at 1173 n.2).  "Actionable as a matter of law" "denote[s] the fact that the publication is of such a character as to make the publisher liable for defamation although no

---

[10]    To be sure, plaintiffs had not registered their trademark with USPTO.  *Cf.* Sealed Document at 10, ECF No. 15 (defendants suggesting that they had "every right" to use the Safex trademark because it was unregistered).  Even cursory research, however, would have revealed to defendants that Safex need not have registered its trademark with the USPTO in order to own that trademark, information any reasonable person would have obtained before publicly lobbing the weighty accusation of trademark infringement, and defendants' failure to do so, in light of other evidence indicating that this category of statements was knowingly false, constitutes reckless disregard of the truth.

[11]    As noted, even if the negligence standard, rather than the actual malice standard, applied to plaintiffs' defamation claim, the outcome of this analysis would not differ.  *See supra* note 9.  Since actual malice is a more demanding culpability standard than negligence, *see, e.g.*, *St. Amant*, 390 U.S. at 731; *McFarlane*, 91 F.3d at 1509, 1515, the fact that plaintiffs have demonstrated that defendants acted with actual malice necessarily implies that they have also shown that plaintiffs have acted with "at least negligence," *Oparaugo*, 884 A.2d at 76 (quoting *Crowley*, 691 A.2d at 1173 n.2).  In other words, evidence suggesting that defendants made these statements knowing that they were false, and with the intention of harming plaintiffs, suffices to establish that defendants were at least negligent in making such statements.

special harm results from it."  RESTATEMENT (SECOND) OF TORTS § 569, cmt. b (1977) (cited in

*Oparaugo*, 884 A.2d at 79).  Statements, like these, that affect plaintiffs "business, trade, [or]

profession" are actionable as a matter of law irrespective of special harm.  *Id.* § 569, cmt. e; *see*

*also id.* (noting that statements "that attribute to the [plaintiff] conduct or characteristics

incompatible with the proper conduct of his lawful trade or profession" are actionable as

defamation without need to show special harm).

Accordingly, plaintiffs have demonstrated that they will likely be able to prove all four

prongs of the defamation analysis, and have therefore shown that they will likely succeed on the

merits of their defamation claim as to this category of statement by defendants.

### c.  Defendants' Statements Regarding Plaintiffs' Criminality

Plaintiffs' likelihood of success as to their defamation claim based on defendants'

statements to the effect that plaintiffs are operating a scam or facilitating criminal activity is

another matter, however.  The statements in this category that plaintiffs seek to enjoin include

that (1) Dabek worked in Serbia developing a cryptocurrency called Dascoin, (2) Dascoin was an

exit scam or Ponzi scheme, and (3) Dascoin was subject to a cease and desist order from the

British Columbia Securities Commission, as well as enforcement action, including an $11

million seizure, in Poland.  This category of statements also includes defendants' conclusions, on

the basis of the preceding factual claims, (4) that Safex also is, or may be, an exit scam, (5)

comparing Safex to Silk Road and Alphabay, and, (6) more specifically, that Safex may be used

to facilitate illegal transactions, thereby "ignor[ing] and undermin[ing] the [U.S.] judicial

system."  Compl. ¶ 113.[12]  Plaintiffs face a daunting challenge in succeeding on this claim, as

---

[12]      Specifically, the online statements that Safex is a scam, which plaintiffs argue are actionable defamation,
are (1) "Safex dabek took down livecoin to get the fuck out now wgen [sic] it goes back up it will be worse and you
won't get funds out do not deposit at livecoin @livecoin_net Safex has hijacked xcalibra is going too!!!!," Dabek
Decl. ¶ 110, and (2) "#safexexecitscam jump shippppppp the boat is sinking!!!!!!!," *id.* ¶ 110, and (3) "Warning

they would need to prove both that these statements are false and that defendants published these statements with actual malice, *see supra* Part III.B.1.a.

To succeed on their defamation claim, plaintiffs would need to prove that these statements are false. The difficulty of proving any negative is obvious, and such a challenge applies equally here to prove that Safex is not an exit scam and is not or will not become a hub for illegal commerce. Nonetheless, plaintiffs have made only the barest attempt to demonstrate the falsity of such claims. As noted during the January 26, 2021 hearing, plaintiffs' original submissions in support of their Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction "ma[de] no attempt to show that these statements, allegedly by defendants, are false, other than to say they are false." Hr'g Tr. at 65:18–22. For instance, in his original declaration, plaintiff Dabek did not deny that he worked in Serbia, that he was a developer for Dascoin, or that Dascoin was subject to enforcement actions in Canada and Poland. *See generally* Dabek Decl. Nor did Dabek elaborate on his connection with Dascoin and its founders, or otherwise attempt to rebut the allegation that Dascoin was a scam. *See generally id.* To the contrary, at the January 26, 2021 hearing, plaintiffs "conceded [as] true," Hr'g Tr. at 66:3, the first three statements in the second category enumerated above, namely that that Dabek was involved in the development of Dascoin in 2017 and that "there was an investigation into DasCoin by certain authorities overseas," *id.* at 21:13–21, although they denied that Dabek engaged in any wrongdoing or criminality, noting, for instance, that he "was never contacted by

---

warning to all @livecoin_net and @safex users this is an exit happening right now DO NOT DEPOSIT WHEN IT GOES BACK UP DO NOT USE XCALIBRA @xcalibrasupport." *Id.* ¶ 111. The statement comparing Safex to Silk Road and Alphabay that plaintiffs identify as defamation is, "Can you imagine how incredibly stupid it would have been for alphabay or silk road founders to have used Twitter o[r] [Facebook] to advertise their market. Only safex thinks it can make software that ignores and undermines the us judicial system and then expect its protections." Compl. ¶ 139; Dabek Decl. ¶ 113.

anyone in law enforcement, was never investigated by anyone in law enforcement, [and] nobody in law enforcement ever accused him of doing anything wrong," *id.* at 21:21–24.

Seizing on the Court's observation that plaintiffs had not adequately addressed the truth or falsity of defendants' statements, plaintiff Dabek has since submitted a supplemental declaration. *See* Dabek Suppl. Decl. In his supplemental declaration, Dabek explains that during significant portions of 2017, after he "was contacted by a Dascoin executive who provided [him] with a comprehensive business plan," he "was an independent consultant for . . . Dascoin," in which role he was "tasked with helping to implement Dascoin's payment and lending platforms" and "helped Dascoin identify and hire technical talent[,] including programmers, cryptographers, and other technical blockchain professionals." *Id.* ¶¶ 9–11. He denies that he was "aware of any government investigations into Dascoin while [he] was an independent consultant," *id.* ¶ 13, or that he was personally "engaged in any Ponzi scheme, 'exit scam,' or 'pump and dump' scheme" while working for Dascoin, *id.* ¶ 18. In short, he states that defendants' accusations that he played a role in the Dascoin "Ponzi scheme and other scams supposedly perpetuated by insiders at Dascoin" are false. *Id.* ¶ 17. Regarding Safex, he states that defendants' claim that it is an exit scam is false, that he has "devoted countless hours to developing" Safex's products and has "no plans to abandon Safex and [is] committed to developing the platform to its fullest potential," *id.* ¶ 19, and that, unlike on Silk Road and Alphabay, "[t]hird party merchants that are caught attempting to sell illicit goods and services on [Safex Marketplace] will be delisted from the platform," *id.* ¶ 21, such that defendants' comparisons of Safex Marketplace to Silk Road and Alphabay are also false, *see id.* ¶ 20.

For two independent reasons, however, both of which suffice to establish that plaintiffs will not succeed on the merits of their defamation claim as to this category of statements,

Dabek's supplemental declaration does little to help plaintiffs.  First, as a limited-purpose public figure, Dabek must demonstrate that defendants made these statements with actual malice, which plaintiffs have failed, and will be unable, to do.  Second, for purposes of the legal issue before the Court, defendants' statements cannot, consistent with the First Amendment, qualify as actionable defamation.  These two defects are discussed in turn.

### i.  Plaintiffs Have Not Demonstrated that Defendants Acted with Actual Malice

As explained above, *see supra* Part III.B.1.b, the "daunting" actual malice standard, *Jankovic*, 822 F.3d at 590 (quoting *McFarlane*, 91 F.3d at 1515), requires plaintiffs to prove that these statements were made "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not," *N.Y. Times Co.*, 376 U.S. at 280.  Crucially, plaintiffs have made no attempt to show *any* culpability—not even the much less demanding standard of negligence that ordinarily applies to a defamation action—on the part of defendants.  *See generally* Pls.' Mem. at 19–26.  As such, they have provided the Court no basis on which to determine that they will likely succeed in proving actual malice and thus succeed on their defamation claim based on this category of statements.

Nor could they.  In light of the suggestive information connecting Dabek with Dascoin, publicly available on the internet, and the self-evident similarities between Safex's products and Silk Road and Alphabay, plaintiffs will be unable, as a matter of law, to demonstrate that defendants acted with actual malice.  In other words, given the information online connecting Dabek with Dascoin, and the anonymity of Safex's cryptocurrencies and the Safex Marketplace, plaintiffs cannot prove that defendants acted with actual malice in warning that Safex is also a scam and that Safex Marketplace will be used for illegal purposes, even if those propositions ultimately turn out not to be true.  That statements in this category may eventually be determined

to be false does not change this analysis, as the Supreme Court "has been careful to instruct that

falsity alone may not suffice to bring . . . speech outside the First Amendment," *United States v.*

*Alvarez*, 567 U.S. 709, 719 (2012), and indeed the very purpose of the actual malice standard is

to provide speakers with "breathing space," *N.Y. Times Co.*, 376 U.S. at 272 (quoting *NAACP v.*

*Button*, 371 U.S. 415, 433 (1963), to state occasional inadvertent falsehoods, given "[t]hat

erroneous statement is inevitable in free debate, and . . . must be protected" if freedom of

expression is to survive, *id.* at 271.  Regardless, as explained in greater detail below, *see infra*

Part III.B.1.c.ii, defendants' public statements that Safex is a scam and that Safex Marketplace

might be used to facilitate illegal commerce are predicated on facts that plaintiffs have conceded

as true, revolving around Dabek's past involvement with Dascoin.  Given that defendants'

interpretation of these facts is not utterly without foundation, it surely cannot be said that in

publicizing them, defendants have acted with reckless disregard of the truth, much less with

knowledge that those statements are false, *see N.Y. Times Co.*, 376 U.S. at 279–80.  Accordingly,

plaintiffs cannot show that defendants made this category of statements with actual malice, and

therefore have failed to demonstrate that they will likely succeed on the merits of their

defamation claim with respect to this category of statements.[13]

---

[13]     As noted, application of the negligence standard, rather than the actual malice standard, would not change the outcome of this analysis.  *See supra* note 9.  With respect to this category of statements, even if the actual malice standard did not apply, plaintiffs would be unable to prove that these statements were made even with mere negligence.  Negligence in this context is "'a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others,' . . . *i.e.*, 'a failure to make a reasonable investigation as to the truth.'" *Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C. 1995) (citation omitted) (quoting *Moss v. Stockard*, 580 A2d. 1011, 1025–26 (D.C. 1990)).  As just explained, plaintiffs have made no attempt to show that defendants made these statements with *any* level of culpability—not even negligence—and, furthermore, plaintiffs' failure to demonstrate defendants' actual malice rests on a determination that this category of statements is not wholly without factual foundation.  Given the Court's conclusion that, as a matter of law, defendants' statements claiming plaintiffs' wrongdoing had some possible basis, plaintiffs cannot show that defendants failed "to observe an ordinary degree of care in ascertaining the truth" of these claims before stating them publicly, *Kendrick*, 659 A.2d at 822.  Accordingly, plaintiffs have not shown that defendants were even negligent in making this category of statements, and so they are unlikely to succeed on the merits of their defamation claim with respect to this category of statements regardless of whether the actual malice or negligence standard is applied.

### ii.   *These Statements Are Not Actionable Defamation Because They Do Not Present a Verifiable Issue of Fact*

Plaintiffs' inability to prove, and failure to even argue, actual malice is dispositive of their likelihood of success on the merits as to their defamation claim based on this category of statements, and thereby precludes injunctive relief as to those statements.  Plaintiffs will not succeed on the merits for a second independent reason, however, namely that this category of statements does not present a verifiable issue of fact and therefore is not actionable under defamation law.  As noted, plaintiffs have acknowledged that some of defendants' factual claims about Dabek's involvement with Dascoin are in fact true, whereas the ultimate conclusions that defendants have drawn from this body of facts, namely that Safex, like Dascoin, is a scam and, like Silk Road and Alphabay, will be used to facilitate illegal transactions, are disputed.  In these circumstances, defendants' statements of their opinion about the conduct of Safex's founder and the likely trajectory of the company and its products, based as they are on concededly true facts, cannot be the basis for defamation liability.

The First Amendment does not "create a wholesale defamation exemption for anything that might be labeled 'opinion,'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990); *see also id.* at 21 (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment"), in large part because "expressions of 'opinion' may often imply an assertion of objective fact," *id.* at 18.  Indeed, when a statement of opinion can "'reasonably [be] interpreted as stating actual facts' about an individual," *id.* at 20 (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)), and "contain[s] a provably false factual connotation," *id.*, it may be actionable defamation, so long as the other requirements of defamation and First Amendment law are satisfied.  *See, e.g.*, *Moldea I*, 15  F.3d at 1142.  Whether a statement is

actionable because it contains a provably false statement of fact is a question of law for the court to decide. *See id.  But see Mann*, 140 S. Ct. at 345–46 (Alito, J., dissenting from denial of petition for a writ of certiorari) (noting circuit split on whether this is legal question for court to decide or factual question for jury to decide).

The First Amendment is thus not a blank check to make defamatory statements under the guise of stating an opinion.  At the same time, however, defendants' statements at issue here are nonetheless entitled to significant First Amendment protection.  Speakers "must be given some leeway to offer 'rational interpretation' of ambiguous sources," *Moldea II*, 22 F.3d at 313 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 519 (1991)); *see also, e.g.*, *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) ("[W]here a person claims to have been defamed by statements about matters of public concern, the First Amendment protects robust debate by preventing either 'pure opinion[s]' or truthful statements from serving as grounds for liability." (second alteration in original) (quoting *Milkovich*, 497 U.S. at 20)); *cf. Moldea II*, 22 F.3d at 313, 315 (holding that critical book review "is 'actionable only when the interpretation[] [is] *unsupportable by reference to the written work*,'" and that "[t]his 'supportable interpretation' standard provides that a critic's interpretation must be rationally supportable by reference to the actual text he or she is evaluating" (emphasis added by *Moldea II*) (quoting Pet. for Reh'g at 8)).  As such, "when a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation," *id.*  at 315, and when he or she "offers commentary that is tied to the work being [critiqued], and that is a supportable interpretation of the . . . work, that interpretation does not present a verifiable issue of fact that can be actionable in defamation." *id.* at 313.

The statements at issue here, *see supra* note 12, although arguably framed as speculation about the possibility that Safex may be a scam rather than an outright statement that it is a scam, have a clear factual connotation, *see Milkovich*, 497 U.S. at 20; *see also, e.g.*, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) ("[S]tatements of opinion can be actionable if they imply a provably false fact . . . ." (alteration in original) (quoting *Moldea II*, 22 F.3d at 313)), namely that Safex is an exit scam.  Nonetheless, defendants' warnings that Safex, like Dascoin, are a scam are the kind of "interpretation" of "ambiguous materials" for which the First Amendment dictates "latitude."  *Moldea II*, 22 F.3d at 315.  In light of publicly available information, provided to the Court by defendants, *see* Jan. 25, 2021 Emails; Mar. 26, 2021 Emails, concerning Dabek's past association and involvement with Dascoin and the multiple enforcement actions to which Dascoin was subject on the grounds that it was a scam, and given Dabek's own acknowledgement of his past involvement, as a key developer, with a cryptocurrency subsequently revealed to be a scam, defendants' conclusion that Safex, like Dascoin, is a scam is "rationally support[ed] by reference to" those underlying facts, *Moldea II*, 22 F.3d at 313.  Indeed, when a project with which a person is intimately involved turns out to be fraudulent, concern that a future similar project by the same person may also be fraudulent is not unreasonable.  As such, these statements do "not present a verifiable issue of fact that can be actionable in defamation."  *Id.* at 315.  Accordingly, plaintiffs have not met their burden to show that they are likely to prove that these statements by defendants that Safex is an exit scam are false, and in fact, as a matter of law, will be unable to do so.

Defendants' comparison of Safex Marketplace to Silk Road or Alphabay are likewise not actionable defamation, albeit for a slightly different reason: these statements cannot "reasonably [be] interpreted as stating actual facts" about plaintiffs, *Milkovich*, 497 U.S. at 20 (alteration in

original) (quoting *Falwell*, 485 U.S. at 50), or at least do not connote the factual statements that

plaintiffs claim.  Contrary to plaintiffs' characterization, this category of statements, *see supra*

note 12, does not state "in no uncertain terms[] that Safex and Mr. Dabek *are* running a criminal

enterprise engaged in activities like child pornography, selling firearms, and illicit drugs."  Pls.'

Mem. at 24 (emphasis added).  Rather, it amounts to an observation that Safex Marketplace

might be attractive to users because of its similarity to Silk Road and Alphabay, namely its

ability to facilitate illegal commerce.  That observation does not appear to be false, given that the

anonymity of the Safex Marketplace and Safex Cash, which are integral features of those

products, might encourage some users to buy and sell illegal products and services on the Safex

Marketplace platform, confident that any illegal activity would not be traceable to them.

At most, then, defendants' statements can reasonably be interpreted as observing, or

restating, indisputable facts about the anonymity of Safex's products or, alternatively, about the

fact that other anonymous social media users have observed those same similarities between

Safex Marketplace on the one hand and Silk Road and Alphabay on the other.  As explained, *see*

*supra* Part III.B.1.a, defendants are not the only individuals to observe this similarity and, in fact,

in the very Twitter post that plaintiffs object to, *see* Def.'s Mem. at 10; *see also* Dabek Decl., Ex.

DD, Jan. 7, 2021 Twitter Post, ECF No. 4-31, the poster, allegedly Joey Lathus, included four

attached images of *other* Twitter users likening Safex Marketplace to Silk Road.[14]  Nor are those

four the only online users, other than defendants, to note Safex Marketplace's potential to

become a marketplace for illicit goods and services, facilitated by the anonymity of Safex's

cryptocurrencies.  *See* Jan. 25, 2021 Emails; Mar. 26, 2021 Emails; *see also supra* Part III.B.1.a

---

[14]    For instance, in this Twitter post, Lathus cites another anonymous user posting "$SAFEX is silk road v. 2.0… Going to be big…" and another who writes, "Privacy coin $safex about to launch #MainNet in couple of days" and notes that "[i]ts e-commerce platform will be . . . decentralized & anonymous."  Jan. 7, 2021 Twitter Post.

(summarizing and sampling some of these third-party statements).  Of course, the speculation of anonymous people on the internet does not mean that Safex Marketplace in fact is being used, or will be used, for such illicit activities.  Yet this category of statements for which plaintiffs seek to impose defamation liability on defendants consists largely of nothing more than observations that *other* online users believe that Safex resembles Silk Road and Alphabay.

In sum, then, plaintiffs have met their burden of showing that they will likely prevail on their defamation claim to the extent the basis is the category of defendants' statements that plaintiffs are infringing defendants' trademark.  Accordingly, analysis of the remaining preliminary injunction factors as to this category of statements continues below.  By contrast, plaintiffs have failed to show that they will likely prevail on the part of their defamation claim concerning the category of defendants' statements warning about the criminality of Safex's products.  Failure to demonstrate likelihood of success on the merits forecloses the possibility of a preliminary injunction, *see Ark. Dairy Co-op Ass'n, Inc.*, 573 F.3d at 832, and, consequently, plaintiffs' request for a preliminary injunction enjoining defendants from continuing to make such statements is denied.

### 2.   *Remaining Preliminary Injunction Factors as to Defendants' Statements Regarding Plaintiffs' Trademark Infringement*

As explained, *see supra* Part III.B.1, plaintiffs have demonstrated likelihood of success on their defamation claim with respect to defendants' statements that plaintiffs are infringing defendants' trademark, but not with respect to defendants' statements that plaintiffs are operating an exit scam and likening Safex Marketplace to Silk Road or Alphabay.  Accordingly, the remainder of the preliminary injunction analysis proceeds with respect to the former category of statements, but not the latter.  Plaintiffs have demonstrated that, as to defendants' statements that

plaintiffs are infringing defendants' trademark, the remaining three factors favor injunctive relief.

### a. Irreparable Harm

As explained, *see supra* Part III.A.2, defendants' alleged infringement of the Safex trademark will likely cause plaintiffs irreparable injury if not enjoined.  Defendants' public statements that plaintiffs are in fact infringing their trademark exacerbates that irreparable injury, and plaintiffs point to several specific harms that they are currently suffering and will continue to suffer as a result of these statements.  The suspension of plaintiffs' social media accounts, prompted by defendants' claims of trademark infringement, has inhibited plaintiffs' ability to market the launch of Safex Marketplace.  Dabek Decl. ¶¶ 127, 129–31.  Additionally, there is currently a unique "boom" in cryptocurrencies, particularly since December 2020, with the value of many cryptocurrencies increasing dramatically, *id.* ¶ 132, and according to plaintiffs, "there has never been a time period in which more investments have poured into cryptocurrency and more buyers are in the market," *id.* ¶ 134.  Plaintiffs' delisting from some listing websites and cryptocurrency exchanges and removal from social media websites means that Safex's currencies have been "hamstrung," *id.* ¶132, however, missing out "from gaining market share during this historic influx of capital into the cryptocurrency market," Pl.'s Mem. at 11.

Defendants' prior attempts to have plaintiffs terminated or delisted from social media, cryptocurrency exchanges, and cryptocurrency listing websites have caused reputational harm, by suggesting that Safex and its products are illegitimate or illegal.  *See* Dabek Decl. ¶ 139 (noting that potential cryptocurrency customers rely on listing websites to determine whether a given currency is legitimate).  There is more such harm to which plaintiffs would likely be subject absent a preliminary injunction.  More deplatforming from social media, or delisting

from listing website or currency exchanges, on the basis of defendants' allegations of trademark infringement, would further degrade plaintiffs' reputations and inhibit their attempts to make Safex's cryptocurrencies and the Safex Marketplace a success. Furthermore, as explained, *see supra* Part III.A.2, the evidence suggests that defendants will continue to wage their public relations campaign against plaintiffs and their products, including by continuing to assert to other platforms, including social media platforms, other currency exchanges, and other listing websites, that plaintiffs are infringing defendants' trademark. Accordingly, plaintiffs have shown that defendants' alleged trademark-infringement-based defamation will cause them irreparable injury absent an injunction.

### b.  The Balance of Equities and the Public Interest

As explained, the balance of equities and the public interest both favor preliminary injunctive relief as to defendants' alleged trademark infringement, *see supra* Part III.A.3, and defendants' likely defamatory statements that plaintiffs are infringing defendants' trademark are closely related to, and exacerbate, the harm caused by their trademark infringement, *see supra* Part III.B.2.a. In particular, defendants' likely false statements that plaintiffs have infringed defendants' trademark will reasonably cause confusion and has in fact caused at least one variety of such confusion, leading social media platforms, cryptocurrency listing websites, and cryptocurrency exchanges to remove from their platforms plaintiffs and their products. Preventing such confusion is in the public interest, *see Delta Sigma Theta*, 215 F. Supp. 3d at 21; *Crime Control, Inc.*, 624 F. Supp. at 582, and accordingly, the balance of equities and the public interest both favor an injunction as to this category of defendants' allegedly defamatory statements.

**IV.     CONCLUSION**

For the foregoing reasons, plaintiffs have shown that they will likely succeed on the merits of their trademark infringement claim against defendants, that they will suffer irreparable harm from that infringement absent a preliminary injunction, and that the balance of equities and the public interest both favor injunctive relief as to defendants' alleged infringement.  Plaintiffs have also shown that they will likely succeed on their defamation claim as to defendants' statements that plaintiffs are infringing defendants' trademark, and the remaining three preliminary injunction factors are satisfied as to those statements, for the same reasons they are satisfied with respect to plaintiffs' trademark infringement claim.  Defendants will therefore be preliminarily enjoined from both infringing plaintiffs' trademark and publicly stating that plaintiffs are infringing defendants' trademark.  On the other hand, plaintiffs have failed to show that they will likely prevail on their defamation claim based on defendants' statements that plaintiffs are or may be engaged in an exit scam and likening Safex Marketplace to Silk Road and Alphabay, and so plaintiffs' motion for a preliminary injunction as to those statements is denied.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 26, 2021

_____
BERYL A. HOWELL
Chief Judge